# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| UNITED STATES | § | Case No. 94-40823-R |
| BRASS CORPORATION, | § | |
| | § | Chapter 11 |
| Debtor. | § | |

## BRASS TRUST'S MOTION TO REOPEN CASE FOR LIMITED RELIEF

TO THE HONORABLE BRENDA T. RHOADES,
UNITED STATED BANKRUPTCY JUDGE:

The Brass Trust files this Motion to Reopen Case for Limited Relief (the "Motion") seeking an order reopening the U.S. Brass Chapter 11 case for the sole purpose of (a) setting a bar date for the filing of Plumbing Claims against the Brass Trust and (b) approving the Trust's proposed notice of bar date, so that, almost two decades after US Brass stopped manufacturing and marketing polybutylene plumbing products, if there are still any viable claims remaining out there, those claims can be addressed and the Trust can then, on further application to the Court, wind down its affairs and close down.

In support of the Motion, the Brass Trust respectfully states as follows:

## I.
## JURISDICTION

1. The Court has jurisdiction over the Motion pursuant to 11 U.S.C. § 350. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

# II.
# PRELIMINARY STATEMENT

A. **The Bankruptcy.**

2. The Debtors' Fourth Amended Disclosure Statement, at page 23, reports that: After Qest Products, Inc., was merged into U.S. Brass in 1980, U.S. Brass manufactured and marketed a polybutylene plumbing pipe system known as the Qest Qick/Sert II System (the "Qest II System"). This system was manufactured and marketed for residential site-built installations from 1979 through 1986 and for other uses (including mobile homes, recreational vehicles, and prefabricated structures) from about 1975 through 1990. As a result of certain alleged defects in the Qest II System and other polybutylene products U.S. Brass manufactured and marketed, U.S. Brass, together with other pipe and fitting manufacturers, builders, developers, and plumbing contractors, was sued for damages by homeowners, homeowner associations, developers, builders and plumbing contractors. These lawsuits generally alleged that the Qest II System developed leaks and sought recovery based on negligence, breach of warranty, strict tort liability and, in some cases, fraud or misrepresentation.

3. On May 23, 1994, the United States Brass Corporation ("U.S. Brass" or "Debtor") filed for protection under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division ("this Court"). The case was styled *In re United States Brass Corporation*, Case No. 94-40823-R (the "Bankruptcy Case").

4. By order dated February 24, 1998 (the "Confirmation Order"), this Court confirmed the Fourth Amended Plan of Reorganization proposed by the Debtor, Eljer Industries, Inc. ("EII"), and Eljer Manufacturing, Inc. ("EMI"), as modified, dated January 13, 1998 (the

"Brass Plan"), in the Bankruptcy Case. On March 19, 1998 (the "Effective Date"), the Plan became effective.

5.  On October 17, 2008, the Court entered the Final Decree closing the estate of United States Brass Corporation.

6.  The Brass Plan created the Brass Trust, which assumed control over certain funds and assets of U.S. Brass for the purpose of resolving polybutylene-related plumbing claims against U.S. Brass. The Brass Trust has been operating for 12 years now and addressed any known claims. After a surge of plumbing claims in its earliest days, the Trust has received only two claims in the last six years. Both of those claims have been denied, one for seeking relief from the wrong Trust, and the other for, among other things, being time-barred.

B.  **The Relief Sought in This Motion.**

7.  The Trustees of the Brass Trust have determined that it is prudent and appropriate to wind down the Brass Trust. Because no bar date was set for the filing of polybutylene-related plumbing claims, the Trustees believe it is prudent and appropriate to have a bar date set for the submission of such claims, publish notice of that bar date, adjudicate any resulting claims, and then, upon further Court approval, wind down and terminate the Trust.

8.  To that end, pursuant to 11 U.S.C. § 350(b), Bankruptcy Rule 5010, and the Fifth Circuit's holding in *INA v. NGC Settlement Trust (Matter of National Gypsum Company)*, 118 F.3d 1056 (5th Cir. 1997), the Brass Trust requests that the Bankruptcy Court reopen the Bankruptcy Case for the limited purpose of setting a bar date for the submission of claims to the Trust and approving the Trust's proposed notice of that bar date. After the bar date has passed and any resulting claims adjudicated, the Trust will return to the Court for approval to terminate the Trust.

9. Setting a bar date in 2010 is fully consistent with the overall goal and purpose of the Brass Trust to coordinate with and complement the relief provided by the Consumer Plumbing Recovery Center ("CPRC") under the terms of the Cox nationwide polybutylene plumbing class action settlement ("Cox Settlement"). After 15 years of providing over $1 billion of relief to home owners across the nation under the Cox Settlement, the CPRC is in the process of shutting down as the time to file claims under that settlement has expired. The Brass Trust is governed by a board of trustees that, under the terms of the U.S. Brass Plan of Reorganization, consists of the same individuals who serve on the board of directors of the CPRC, and the Brass Trust claims' process is administered by the CPRC. Moreover, under the terms of the U.S. Brass Plan of Reorganization, the Brass Trust has directed 80% of all funds it has received during its existence to the CPRC to pay plumbing claims under the Cox settlement (many of which, of course, concern plumbing manufactured by U.S. Brass). With the Cox Settlement now complete and the CPRC closing down, it is time for the Brass Trust to begin the same process by obtaining a bar date for claims. This is especially so given that the Brass Trust has only received two claims in the last six years, and both of those claims were denied.

## III.
## STATEMENT OF FACTS

**C.     The Plan's Treatment of PB Claims against US Brass**

10.     The Brass Trust was created on the Effective Date of the Plan. Brass Plan §7.1. On or about the Effective Date, the Debtor transferred assets to the Brass Trust, and all polybutylene related "Plumbing Claims" against the Debtor, EMI and EII, were channeled to the Brass Trust for treatment under the Plan.

11. The Brass Plan at §1.1(kkkk) defines "Plumbing Claim" as "any claim, debt, right to payment, obligation or liability (under any theory of common or statutory law or equity) against the Debtor, EMI and EII and any of their respective Affiliates, whether or not in existence, known, or arising prior to or after the Effective Date, and whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured…."

12. The Debtor's Fourth Amended Disclosure Statement, dated September 24, 1997 ("Disclosure Statement"), provides that "Plumbing Claims (Class 5) include all Claims arising before or after the Effective Date…for compensatory, statutory, or punitive damages relating to Brass Polybuylene Systems, and *arising from acts or omissions occurring before the Effective Date….*" (Emphasis added.)

13. The Brass Plan, at §7.6(a), provides that ".... the Brass Trust shall assume on behalf of US Brass, EMI and EII, the obligation to pay ... all Plumbing Claims against the Debtor, EMI and EII … except Cox Plaintiffs Claims and Shell/Celanese Claims." Brass Plan §7.6(a).

14. The Plan clearly contemplated that the existence of the Brass Trust would be co-terminus with the existence of the CPRC. For example, Cox Plaintiffs Claims were, under the Brass Plan and its ancillary documents, referred to the CPRC for handling under the Cox Class Settlement. Plan §4.1(e)(iii). The Trustees of the Brass Trust are to be those who are serving as the Directors of the CPRC. Plan §7.1(b). Of the proceeds received by the Brass Trust from Insurance Recoveries or from Eljer pursuant to the Eljer Note provided for in the Plan, 80% was to be sent to the CPRC for use in the Cox Class Settlement. Plan §14.2(a)(i). Further, claims

against the Brass Trust were by agreement handled by the CPRC. The Cox Class Settlement ends this year and the CPRC is closing at the end of June, 2010.

15. The Brass Plan set forth the mechanism by which Plumbing Claims would be treated. Pursuant to section 4.1(e) of the Plan, "each Plumbing Claim shall be liquidated and Allowed or Disallowed pursuant to the ADR [Alternative Dispute Resolution procedures adopted with the Plan], and each holder of an Allowed Plumbing Claim shall receive from the Brass Trust payment on the Distribution Date in Cash in the amount of such Allowed Plumbing Claim…with Post-Confirmation interest." Brass Plan §4.1(e)(i).

**D.** **The Brass Trust's Claims History**

16. Since the early 1980's, numerous vigorous attempts have been made to identify polybutylene plumbing claimants against U.S. Brass.

17. For example, in this very Bankruptcy Case back in 1995, the PB Claimants' Committee filed a motion to approve a notice program for polybutylene claims against the Debtor, and to extend the then-existing bar date for PB Claims. Eljer Manufacturing, the sole shareholder of US Brass, and Eljer Industries, the sole shareholder of Eljer Manufacturing, objected to that motion in their "Objection of Eljer Manufacturing, Inc. and Eljer Industries, Inc. to the Motion of PB Claimants Committee to Approve Notice Program and Use of Alternative Claim Form and To Extend the Bar Date for PB Claims," Docket No. 637 ("Eljer Objection"), In that objection, Eljer opposed to PB Claimants motion on the grounds that, among other things, the Debtor had already, by 1995, spent 15 years beating the bushes for polybutylene claimants. After U.S. Brass started getting sued for polybutylene plumbing in the early 1980s:

> "Over the ensuing 15-year period, extensive efforts were undertaken by the Debtor and others, including the members of the PB Committee, to identify potential Plumbing Claimants. These efforts have included, among other things,

**BRASS TRUST'S MOTION TO REOPEN CASE FOR LIMITED RELIEF – Page 6**

national and regional television and print ads, the formation and operation of the Polybutylene Claims Group, Inc. (the "PCG") to receive inquiries regarding potential claims and to provide for the settlement thereof, and extensive mail campaigns. As a result of these efforts, approximately 35,000 Plumbing Claims have been identified and settled by the PCG, approximately 14,000 Plumbing Claims have been settled directly by the Debtor, less than 2,000 Plumbing Claims have been made the subject of judgments obtained in litigation initiated by members of the PB Committee, and approximately 30,000 additional putative Plumbing Claims are the subject of litigation that was pending as of the commencement of this chapter 11 case."

Eljer Objection, Docket No. 637, at pp. 4-5.

18. Later, a published notice relating to the Brass Plan had been issued in the fall of 1997 by Rust Consulting. Affidavit of Tim Taylor, ("Taylor Affidavit"), ¶ 3 (attached as Exhibit B).

19. After confirmation, the Notice of Entry along with a Plumbing Claim "Claims Verification Form" ("CVF") was mailed out to 35,077 claimants on June 17, 1998, by the Brass Trust administrator. Subsequent CVFs were sent out through 2002. By December 31, 2002, there were 35,499 net recipients of CVFs. Some 5,740 filled-out CVFs were received back from claimants between 1998 and July 2004. Taylor Affidavit, ¶ 4.

20. Pursuant to the procedures set forth in the Brass Plan and ADR, after the CVF forms were received, a Confirmation of Loss form ("COL") was mailed on November 1, 1998, to 3,426 claimants who would not fall under the proposed Administrative Convenience Class (as defined below) and 1,557 filled-out COLs were returned to the Trust through June 2001. All of these claims have long since been adjudicated or barred under the terms of the Brass Plan and ADR. Taylor Affidavit, ¶ 5.

21. At the September 1998 Brass Trustees meeting, it was proposed and adopted that an Administrative Convenience Class of claimants be established consisting of all known

claimants timely filing a CVF who have positively responded that such claimant has suffered a leak in a U.S. Brass/Qest component of the polybutylene system in its property. Taylor Affidavit, ¶ 6.

22. At the same Brass Trustees meeting, it was further resolved that each member of the Administrative Convenience Class be offered, in full and complete settlement of all claims against the Debtor, $250.00, provided that any member of the Administrative Convenience Class whose total claims for damages resulting from qualifying leaks was less than $250.00 shall be offered an amount equal to 100% of such claim but in no event less than $100.00. All Administrative Convenience Class claims have long since either been adjudicated or barred under the terms of the Brass Plan and the ADR. Taylor Affidavit, ¶ 7.

23. Only two claims have been received by the Trust since 2004. Both claims have been denied. One was determined to be a Cox Class claim, and referred to the Cox Class settlement trust under the terms of the Brass Plan, and the other was determined to be time-barred under a ten-year limitation set forth in the ADR. Taylor Affidavit, ¶ 8. There is no reasonable expectation that any valid claims exist at this point in time and no reason to keep the Trust open and incurring administrative costs. Taylor Affidavit, ¶ 9.

**E.   The Need for a Bar Date.**

24. The Plan and its ancillary documents did not set a bar date for the submission of Plumbing Claims. In light of the sparse and random recent claims history of the Trust, the Trust would like to have a bar date set by the Court, publish notice of that bar date, adjudicate any claims that may result and then, upon further application to the Court, close down the Trust and dismiss the Trustees. The Trust requests August 30, 2010, be set on the bar date for the submission of Plumbing Claims.

## F. The Propriety of the Proposed Notice

25. The Trust proposes to give publication notice of the bar date substantially in the form attached as Exhibit A. Such notice is adequate for the reasons set forth below.

## IV.
## ARGUMENT AND AUTHORITY

## G. The Bankruptcy Case Should Be Reopened to Allow Full Administration

26. A motion to reopen a bankruptcy case is governed by 11 U.S.C. § 350(b) and Federal Rule of Bankruptcy Procedure 5010. "A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor or for other cause." Section 350(b). Motions to reopen are made for a variety of reasons, and they can be made by the debtor, the trustee, or any party in interest. *In re Upshur*, 317 B.R. 446, 450 (Bankr. N.D. Ga. 2004); Fed. R. Bankr. P. 5010.

27. The decision on whether to reopen a case is within the broad discretion of the bankruptcy court. *Upshur* at 450, citing *Lopez v. Specialty Restaurants Corporation (In re Lopez)*, 283 B.R. 22, 27 (9th Cir. BAP 2002); *In re Rochester*, 308 B.R. 596, 600 (Bankr. N.D. Ga. 2004); *In re Figlio*, 193 B.R. 420, 424 (Bankr. D. New Jersey 1996); *In re Ashe*, 228 B.R. 457, 461 (C.D. Cal. 1998); *In re Kapsin*, 265 B.R. 778, 780 (Bankr. N.D. Ohio 2001); *Citizens Bank & Trust Company v. Case (Matter of Case)*, 937 F.2d 1014, 1018 (5th Cir. 1991) ("The phrase 'or other cause' as used in Section 350(b) is a broad term which gives the Bankruptcy Court discretion to reopen a closed estate or proceeding when cause for such reopening has been shown."). The Bankruptcy Court should exercise its discretion, based upon the peculiar facts present and determine if cause exists and how ultimately to dispose of the case. *In re Lewis,* 273

B.R. 739, 743 (Bankr. N.D. Ga. 2001); *In re Kapsin*, 265 B.R. at 780, citing *Mendelsohn v. Ozer*, 241 B.R. 503, 506 (E.D.N.Y. 1997).

28. The reopening of a bankruptcy case is considered to be a matter of routine, or a typically ministerial act. *In re Ashe*, 228 B.R. at 462; *In re Lopez*, 283 B.R. at 26; *In re Apex Oil Company*, 406 F.3d 538, 543 (8th Cir. 2005). Motions to reopen should be routinely granted in order to consider the underlying request for relief. *In re Dodge*, 138 B.R. 602, 605 (Bankr. E.D. Cal. 1992); *In re Rettemnier*, 113 B.R. 757, 759 (Bankr. S.D. Fla. 1990). The effect of reopening a bankruptcy case is to put the bankruptcy estate back into the process of administration. This means that the original bankruptcy case is revived, including all of the procedural and substantive rights that belong to the debtor. *In re Figlio*, 193 B.R. 420, 424 (Bankr. D.N.J. 1996).

29. When deciding whether to reopen a bankruptcy case, courts normally weigh three factors: (a) the benefit to the debtor; (b) the prejudice to the opposing party; and (c) the benefit to the creditors. *In re Koch*, 229 B.R. 78, 85-86 (Bankr. E.D.N.Y. 1999), citing *In re Maloy*, 195 B.R. 517, 518 (Bankr. N.D. Ga. 1996); *In re Phelps*, 329 B.R. 904, 909 (Bankr. N.D. Ga. 2005), citing *In re Rochester*, 308 B.R. 596, 601 (Bankr. N.D. Ga. 2004); *In re Lewis*, 273 B.R. 739, 744 (Bankr. N.D. Ga. 2001). One court has narrowed the test when the purpose of reopening the bankruptcy case is to administer assets; in such a case the test is simply "whether the administrative expense and inconvenience outweighs the potential benefit to the estate." *In re Phelps*, 329 B.R. at 909, citing *In re Dewberry*, 266 B.R. 916, 921 (Bankr. S.D. Ga. 2001). Moreover, the court has a duty to reopen a bankruptcy case whenever there is proof that it has not been fully administered. *In re Phelps*, 329 B.R. at 909, citing *In re Upshur*, 317 B.R. at 451; *In re Rochester*, 308 B.R. at 600; *In re Hamlett*, 304 B.R. 737, 740 (Bankr. M.D.N.C. 2003).

## H. A Bar Date for Plumbing Claims Should Be Set.

30. Bankruptcy Rule 3003(c)(3) provides that "[t]he court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed." Fed R. Bankr. P. 3003(c)(3).

31. The circumstances in the instant case justify establishing a Bar Date as requested by the Trust. Efforts to identify holders of polybutylene plumbing claims against U.S. Brass have spanned 30 years and have been vigorous and thorough, as shown above. In the last six years only two claims have been submitted to the Brass Trust. It is prudent and appropriate to set a date certain by which any remaining claims are to be filed with the Trust, so that any such claims can be adjudicated and the Trust can be terminated.

32. The Trust proposes a Bar Date of August 30, 2010.

33. Any holder of a Plumbing Claim who is required, but fails, to file a proof of claim in accordance with the Bar Date Order on or before the Bar Date shall forever be barred, estopped and enjoined from asserting such claim against the Brass Trust, the Trustees or their successors and assigns.

34. Any holder of a Plumbing Claim who timely files a proof of claim will then be subject to the Plan and ADR provisions governing the treatment of Plumbing Claims.

## I. The Proposed Form and Manner of Notice Is Sufficient

35. In conjunction with setting the Bar Date, the Trust will endeavor to ensure that all interested parties receive appropriate notice of such date. To determine the adequacy of the notice given to a creditor, bankruptcy law distinguishes between "known" and "unknown" creditors. *See Chemetron Corp. v. Jones*, 72 F.3d 341, 345 (3d Cir.1995). As the court in

*Chemetron* explained, "[K]nown creditors must be provided with actual written notice of a debtor's bankruptcy filing and bar claims date. For unknown creditors, notification by publication will generally suffice." *Id*. At 346 (citations omitted).

36. The United States Supreme Court has characterized a "known" creditor as one whose identity is either known or is "reasonably ascertainable by the debtor." *Id.* (citing *Tulsa Prof'l Collection Serv., Inc. v. Pope*, 485, U.S. 478, 490 (1988)). An "unknown" creditor is one whose "interests are either conjectural or future or, although they could be discovered upon investigation, do not in due course of business come to knowledge [of the debtor]." *Id*. (citing *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 317 (1950)). At this point in time, any remaining holders of Plumbing Claims against the Brass Trust are "unknown". As shown above, all "known" holders of Plumbing Claims have long since received ample notice and opportunity to submit their claims.

37. In order to provide notice of the Bar Date and the procedures for filing a proof of claim to unknown holders of Plumbing Claims, in accordance with Bankruptcy Rule 9008, the Trust proposes to publish notice of the Bar Date in substantially the form attached to this Motion as Exhibit A (the "Publication Notice"), on or before July 30, 2010, approximately 30 days before the Bar Date.

38. The Trust chose USA Today because USA Today is a paper of national distribution that is most likely to reach the widest audience of creditors that may hold unknown Plumbing Claims. Courts have consistently found that publishing notice in a national publication is sufficient to satisfy due process requirements. *See, e.g., San Augustine County, Tex. v. Cameron County Water Imp. Dist. No. 10*, 202 F.2d 932, 934-35 (5th Cir. 1953); *Chemetron*, 72 F.3d at 348-49 ("Publication in national newspapers is regularly deemed sufficient notice to

unknown creditors, especially where supplemented … with notice in papers of general circulation in locations where the debtor is conducting business."); *see also Frost Nat. Bank of San Antonio v. Texaco, Inc.*, 1997 WL 33770431 (S.D. Tex. 1997)(citing with approval *Chemetron* for the proposition that publication notice is sufficient due process for unknown creditors); *Wright v. Placid Oil*, 107 B.R. 104, 106 (N.D. Tex. 1989) (holding that publication in the Wall Street Journal was sufficient to provide notice to an unknown creditor injured in Louisiana).

39. The Publication Notice will: (i) advise creditors of the necessity of filing a proof of claim by the Bar Date, as set forth in Bankruptcy Rules 3002(a) and 3003(c); (ii) alert such creditors to the consequences of failing to timely file a proof of claim, as set forth in Bankruptcy Rule 3003(c)(2); and (iii) specify the form to be used in filing a proof of claim. For simplicity, the Publication Notice will require the filing of the publicly available Form 10. If a claim is filed, the Trust will follow up with the Claimant to handle the Plumbing Claim in the manner provided in the Plan and ADR.

40. Accordingly, for the reasons set forth in this Motion, the Trust submits that the Publication Notice will provide claimants with sufficient information to timely file a properly prepared and executed proof of claim.

## REQUEST FOR RELIEF

41. For all of the reasons set forth herein, the Trust respectfully requests that the Court enter an order reopening Bankruptcy Case No. 94-40823-R, setting August 30, 2010, as the Bar Date for the submission of Plumbing Claims to the Brass Trust, approving the form and

manner of the proposed Notice of Bar Date attached as Exhibit A, and such other and further relief to which the Trust may be entitled.


Dated:   June 30, 2010

Respectfully submitted,

**STUTZMAN, BROMBERG,
ESSERMAN & PLIFKA,
A Professional Corporation**

By: */s/  Peter C. D'Apice*
Peter C. D'Apice
State Bar No. 05377783
2323 Bryan Street, Suite 2200
Dallas, Texas 75201-2689
Telephone:    (214) 969-4900
Facsimile:     (214) 969-4999

**COUNSEL FOR BRASS TRUST**

# CERTIFICATE OF SERVICE

I certify that on June 30, 2010, I caused a copy of this document to be served on the below via first class mail.

                                                */s/ Peter C. D'Apice*
                                                Peter C. D'Apice

William T. Neary
Timothy W. O'Neal
Office of the United States Trustee
110 N. College Ave. Suite 300
Tyler, TX 75702-7231

Catherine Bracken
U.S. Brass Corporation
14801 Quorum Drive
Dallas, Texas 75240

Michael R. Rochelle
Rochelle McCullough LLP
325 N. St. Paul St., Suite 4500
Dallas, Texas 75201

George W. Hanthorn
Zurn Industries, Inc.
14801 Quorum Drive
Dallas, Texas 75240

Oscar R. Cantu
Weil, Gotshal & Manges, LLP
701 Brickell Avenue
Miami, FL 33131

Thomas E. Lauria
White & Case LLP
First Union Financial Center
200 South Biscayne Blvd.
Miami, FL 33131